UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
UNITED STATES OF AMERICA,              )
                                                        )
                         v.                            )
                                                        ) Criminal No:  21-10196-FDS
GUSTAF NJEI,                                    )
                         Defendants.             )
_____)

## DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL AND/OR A NEW TRIAL AND INCORPORATED MEMORANDUM OF LAW

NOW COMES the Defendant, Gustaf Njei, ("Njei"), through counsel, and hereby renews his motion a judgment of acquittal pursuant to Rule 29(c) and/or for a new trial pursuant to Rule 33(b)(2), as to some or all of the counts of conviction.  In support thereof, counsel states the following:

## I.       FACTS

On December 9, 2022, the Defendant was convicted of all counts of a five count indictment generally alleging a scheme to defraud two victims of their money by "spoofing" email addresses to trick third parties into sending money to bank accounts set up by the Defendant in his name as "Njei Trading" at the instruction of his friend Yannick Minang, ("Minang"), and engaging in a money laundering conspiracy to rapidly liquidate those accounts before the victims or third parties realized the funds were missing or stolen.  The substantive counts charged wire fraud in counts 1 and 2, structuring in count 3, an unlawful wire transaction in count 4 and a money laundering conspiracy in count 5.

It is undisputed that neither Minang nor the Defendant knew the source of the funds. Minang testified that he was suspicious of the source of the funds and suspected that the funds were the proceeds of criminal activity, but did not know what kind.  He testified that he did not

share these concerns with the Defendant when he asked him to open a bank account in his name. On the contrary, Minang told the Defendant that the transactions would be "safe" which to Minang meant that no one had gotten caught.  For their services, Minang and the Defendant would receive 40% of the funds as their fee.  Minang also allegedly told the Defendant that the person involved in the sending the money to the accounts was "old soldier" and that the Defendant supposedly knew that old soldier had threated another individual with a gun who old soldier had mistakenly thought had stolen from him.  The Defendant did not have any contact with old soldier.  Minang was given online access to the Defendant's bank accounts by the Defendant so he could quickly monitor the accounts to see when money came in.  The online access could also have been used to send wires, but Minang could not recall whether he personally sent the wire charged in Count 4.

The evidence at trial showed that the first trench of stolen money hit the Defendant's account two weeks after it was opened on July 14, 2017.   That day, Minang instructed the Defendant to withdraw cash from the account in amounts of less than $10,000 which Minang knew would cause "red flags" for the bank if the withdrawal was over $10,000 and that this was what old soldier had instructed him to do.  On July 14, 2017, the Defendant made four withdrawals from the account totaling $28,500 at four different branches of Bank of America. This the Government alleged in count 3 constituted illegal structuring in violation of 31 U.S.C. Section 5324(a)(1).  However, the evidence at trial established that a CTR was filed and that BOA has a computer system that enables it to track same day transactions at different branches and submit a CTR.  Indeed BOA did submit a CTR for these aggregated withdrawals.  (Exhibit 14).

As to count 4, a wire was sent from the Defendant's account to an account maintained by old soldier in South Africa.  Minang could not recall whether he sent the wire or whether he and the Defendant sent the wire together.

Minang and the Defendant also engaged in a shopping spree with their fees from the first trench.

A second trench of $375,000 was received by the Defendant's bank accounts less than a month later.  The Defendant withdrew $9,200 in cash from this amount which was frozen by the bank before it could be further dissipated.  The Defendant did not engage in any further conduct with these bank accounts or receiving money from old soldier and Minang.

In an effort to prove the charges, the Government was allowed, over the Defendant's objections, to introduce evidence of Minang and the Defendant's social media interactions and Rule 404(b) evidence that occurred after the crime and into 2018 and 2019.  This included the time period in which someone using a fake driver's license with the Defendant's photograph and links to the Defendant's telephone and spam email accounts was alleged to have defrauded an individual out of approximately $1,000.00 by falsely advertising a puppy for sale on the internet. Minang claimed that he and the Defendant were engaged in this conduct in late 2018 when they lived together.

The Government also introduced the Defendant's tax returns which showed that he did not file a "Schedule C" for Njei Trading.  There was no allegation that the Defendant had underreported his income for any tax year.

Lastly, the Government introduced social media evidence showing that Minang and the Defendant went to clubs and interacted on social media after the alleged offenses were committed.  One video showed the Defendant in the backseat of a vehicle with cash in his hands.

## II. ARGUMENT

"To succeed on his Rule 29 motion, [ a defendant] must show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offense beyond a reasonable doubt." *United States v. Acevedo,* 882 F.3d 251, 257 (1st Cir. 2018). The Court does not "weigh the evidence or make any credibility judgments, as those are left to the jury." *United States v. Merlino,* 592 F. 3d 22, 29 (1st Cir. 2010) (citing *United States v. Ayala-Garcia,* 574 F. 3d 5, 11 (1st Cir. 2009)). Rather, the Court "resolves all credibility disputes in the verdict's favor, and then reaches a judgment about whether a rational jury could find guilt beyond a reasonable doubt." *Id. (*quoting *United States v. Olbres,* 61 F. 3d 967, 970 (1st Cir. 1995)). The verdict will be upheld if it is "supported by a plausible rendition of the record." *Id*. (quoting *United States v. Bristol-Martir,* 570 F. 3d 29, 38 (1st Cir. 2009)).

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "In considering a motion for a new trial, district courts may 'weigh the evidence and evaluate the credibility of witnesses, …[but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *Merlino,* 592 F. 3d at 32 (quoting *United States v. Wilkerson,* 252 F. 3d 273, 278 (1st Cir. 2001)).

As to Count 1 and 2, it is undisputed that there was no evidence that the Defendant knew that the proceeds resulted from any kind of fraud let alone wire fraud. Minang did not even know where the proceeds came from except that old soldier was somehow involved. Without this evidence, the Government clearly failed to meet its burden as to all five counts.

Further, as to counts 3 through 5 it is submitted that there was insufficient evidence of knowledge and intent to permit a reasonable jury to convict and thus the Court should enter a judgment of acquittal and/or to order a new trial as to the counts remaining.

Finally, the Defendant submits that pursuant to Rule 33, the interests of justice require granting them a new trial for the same reasons set forth herein.

## A. THE GOVERNMENT FAILED TO PROVE KNOWLEDGE AND INTENT BEYOND A REASONABLE DOUBT

Mere association with other conspirators or mere presence at the scene of the conspiratorial deeds is insufficient to establish proof beyond a reasonable doubt. *United States v. Llinas,* 373 F.3d 26, 30 (1st Cir.2004); *United States v. Dellosantos,* 649 F.3d 109, 115 (1st Cir.2011); *United States v. Zafiro,* 945 F.2d 881, 888 (7th Cir.1991)). Rather, the government must prove the existence of an "agreement or understanding as to each defendant." *Id.* (quoting *United States v. Rivera–Santiago,* 872 F.2d 1073, 1079 (1st Cir.1989)) (internal quotation marks omitted). "[C]onspiratorial agreement need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved." *United States v. Boylan,* 898 F.2d 230, 241–42 (1st Cir.1990).

Here, the evidence viewed in a light most favorable to the Government permits the interference that certain conduct was suspicious to Minang.  However, this evidence standing alone does not constitute a crime and Minang's failure to disclose his suspicions to the Defendant and, instead, certifying the conduct as "safe" does not equate or transfer knowledge to the Defendant.  *United States* v. *Goldberg*, 928 F. Supp. 89, 94 (D. Mass. 1996); *citing United States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996) (mere violation of state ethics law, standing alone, does not satisfy the government's burden to prove intent); *United States* v. *Ramming*, 915 F. Supp. 854, 862 (S.D. Tex. 1996); (violation of internal operating procedures and failure to

disclose conflicts of interest do not, in themselves, constitute federal criminal violations); *United States v. Jain*, 93 F.3d at 442, cert. denied, 520 U.S. 1273 (1997) (Doctor's unethical collection of referral fees for patients was insufficient and immaterial absent independent evidence that he intended to defraud his patients); *United States* v. *Wolf*, 820 F.2d 1499, 1504 (9th Cir. 1987); *United States v. Christo*, 614 F.2d 486, 28 U.C.C. Rep. Serv. (CBC) 777 (5th Cir. 1980) (bank officer cannot be found guilty of misapplication based solely upon a violation of a bank regulation); *United States v. Stefan*, 784 F.2d 1093 (11th Cir. 1986).

There was no evidence at trial that the Defendant knew of the source of the funds. As a result, the Defendant cannot be proven beyond a reasonable doubt to have been guilty of two counts of wire fraud.

Additionally, the evidence in this case was insufficient to show that the Defendant knew that the funds were stolen sufficiently to prove fraud, that he caused an international wire transfer offense, that he caused a bank to fail to file a Currency Transaction Report or that he engaged in money laundering. Knowledge and intent are critical elements of each of the charge offenses. As a result, he must be found not guilty of all five counts.

## B. THE TRIAL COURT ERRED IN ADMITTING PREJUDICIAL EVIDENCE IN VIOLATION OF RULE 404(b)

Rule 404(b) absolutely bars "other acts" evidence relevant only to prove criminal propensity or bad character. *United States v. Tuesta–Toro,* 29 F.3d 771, 775 (1st Cir.1994). This *absolute bar* is implicated, however, if the challenged "other crimes, wrongs, or acts" are relevant *exclusively* to instigate an inference that the defendant is more likely to have acted in similar fashion by committing the offense for which he is on trial. *See, e.g., United States v. Moccia,* 681 F.2d 61, 63 (1st Cir.1982) (citing Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence,* ¶ 404–26 (1980); *see also United States v. Ferrer–Cruz,* 899 F.2d 135, 137 (1st Cir.1990). Plainly,

by its very terms, *see* note 5 *supra,* Rule 404(b) interposes no *absolute bar* to circumstantial evidence *intrinsic* to the crime for which the defendant is on trial, but only to evidence of "*other* crimes, wrongs, or acts" whose probative value *exclusively* depends upon a forbidden inference of criminal propensity. *United States v. Tutiven,* 40 F.3d 1, 5 (1st Cir. 1994).

Prior to trial, the Defendant sought to preclude the introduction of purported Rule 404(b) evidence at trial and evidence that violated Rules 401-403 and Rule 801(d)(2)(E). Following a hearing on August 24, 2022, the Court excluded, without prejudice, evidence of other alleged criminal conduct of the Defendant referred to generally as "puppy fraud" and "PPP loan fraud". (ECF Doc. #98). One of the reasons the defendant had argued for exclusion of this evidence was the fact that these alleged acts were committed more than 2 years after the crimes alleged instant indictment and were not probative of his state of mind in the Summer of 2017. The indicted offenses are alleged to have occurred during a narrow time frame from June 30, 2017 to August 4, 2017. The court later admitted the puppy fraud evidence with an instruction that the jury could not consider it for propensity. This instruction failed to cure the prejudice.

Any knowledge that the defendant may have gained from activities with Minang and others after the conduct in question, cannot substitute for proof that he knew he was committing a crime prior to July 14, 2017. More importantly, none of it has anything to do with the crimes charged. The only purpose of this evidence is "to prove[] criminal disposition," *United States v. Watford*, 894 F.2d 665, 671 (4th Cir. 1990), and to prejudice the jury against the Defendant. The purpose of this evidence is to "demonstrate[] a significant lack of integrity". *Id.*

Here, the government accused the Defendant of engaging in a wire fraud conspiracy where he allegedly opened bank accounts at BOA On June 30, 2017, for the purpose of receiving funds that represented the proceeds of two fraudulent transfers and quickly dissipating those assets

through alleged money laundering and structuring activities by August 4, 2017.  That is the limited time frame and scheme the government may try to prove at trial.  Presenting that case to the jury in no way requires the government to delve into these other topics, which are hornbook examples of inadmissible character evidence.  Even to admit such evidence as "intrinsic" to the crime charged would simply be to allow forbidden character evidence "in more attractive wrapping and other a more enticing sobriquet." *Thompson v. United States*, 546 A.2d 414, 421 (D.C. 1988); *see also United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) (declining to admit "propensity evidence in sheep's clothing").  And in any event, because this evidence is far more prejudicial than it is probative, it is inadmissible under Rule 403 as well.

In our courts, "[a] defendant must be tried for what he did, not for who he is." *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985); *see also United States v. Mothershed*, 859 F.2d 585, 589-590 (8th Cir. 1988) ("We do not convict people of crimes because of their propensities; we do so because of what they have actually done.").  Thus, under Rule 404(b), evidence of a "crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  This rule reflects the "deep seated notion that our system of justice should not permit the trier of fact to infer that because someone was a bad guy once, he is likely to be a bad guy again." *United States v. McCourt*, 925 F.2d 1229, 1235-1236 & n.2 (9th Cir. 1991); *see also United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) (noting that the character-evidence rule "gives meaning to the central precept of our system of criminal justice, the presumption of innocence").  When evidence of prior bad acts is admitted in a criminal trial, the jurors are apt to "prejudge" the defendant as "one with a bad character" and "deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (Jackson,

J.).  Thus, when the government uses prior bad acts to suggest that a defendant committed the acts charged in the case at hand, the government asks the jury to make the kind of inference "specifically prohibited by Rule 404."  *Sparks v. Gilley Trucking Co., Inc.*, 992 F.2d 50, 53 (4th Cir. 1993); *see Bonilla v. Yamaha Motors Corp.*, 955 F.2d 150, 154 (1st Cir. 1992).

That is exactly the inference the Government asked the jury will make here.  Puppy fraud and the Schedule C evidence were designed to show that he must be the "kind of person" who would commit the instant crimes as well.  *United States v. Powell*, 50 F.3d 94, 101 (1st Cir. 1995). In other words, the Government hoped to use this evidence "to show that on three particular occasions he acted in accordance with the character" suggested by the indictment in violation of the character-evidence rule.  *See* Fed. R. Evid. 404(b) *United States v. Robles-Alvarez*, 874 F.3d 46, 51 (1st Cir. 2017) ("Rule 404(b) prohibits the use of prior bad acts evidence 'to prove a person's character in order to show' action in conformity therewith.").

Moreover, in *United States v. Goyner*, 761 F.3d 157, 163 (1st Cir. 2014) the First Circuit held that evidence must be "near in time and place" to be admissible to "to complete the story of the crime on trial". Any evidence offered for this purpose is forbidden by Rule 404.  *See United States v. Manning*, 79 F.3d 212, 217 (1st Cir. 1996) ("[E]vidence of other crimes, wrongs, and acts is not admissible to prove criminal propensity.").  Other unrelated criminal conduct occurring a year or more after the crimes charged in the indictment fail this test as well.

Here, the alleged acts were "dissimilar and remote from the charged offense[s]" and as a result "could [be] offered in reality only to prove [that Defendant] had a criminal past." *United States v. Harvey*, 845 F.2d 760, 762-63 (8th Cir. 1988); *see also United States v. Sanders*, 951 F.2d

34, 37 (4th Cir. 1991) (holding that, because a prior assault was too dissimilar to the charged assault, the evidence tended only to show propensity to commit assaults).

The conduct was offered to force the jury to conclude that the defendant has a bad character and as a result is more likely to do bad things, *e.g.*, commit wire fraud.  "This is the very type of evidence that the limitation imposed by Rule 404(b) was designed to exclude."  *United States v. McBride*, 676 F.3d 385, 398 (4th Cir. 2012).  The evidence was therefore inadmissible at trial under Rule 404(b).

### a.    The evidence was not "intrinsic" to the charged offenses.

As detailed above, the puppy fraud and Schedule C evidence consisted exclusively of a hodgepodge recitation of various crimes, wrongs, and other bad acts.  The modern trend is for the Government to that the proffered evidence is "intrinsic" to the crimes charges.  This argument is one of the redder herrings a court is ever likely to encounter. Although it is true that "evidence which is 'inextricably intertwined' with the crimes charged is often admissible under Rule 404(b)," *United States v. Rodriguez-Estrada*, 877 F.2d 153, 156 (1st Cir. 1989), the government's proposed evidence here is not "intertwined" with the crimes charged, much less "inextricably intertwined."

For evidence to count as "inextricably intertwined," it must form "an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted."  *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).  "In a trial for armed bank robbery, for example, an eyewitness would be allowed to testify that the defendant struck the teller in the course of demanding the money, even though the defendant was not charged with assault or battery." 1 Mueller & Kirkpatrick, *Federal Evidence* § 4:33 (4th ed.) (2018).  Similarly, in a trial for drug dealing, the government is allowed to offer evidence of drug possession.  Mueller & Kirkpatrick, *Evidence* (5th ed.) (2012) § 4.15 at 199.  And in a trial for

drug possession, the government may offer evidence that the defendant possessed drug paraphernalia.  *See United States v. Manning,* 79 F.3d 212, 218 (1st Cir. 1996).  In situations like those, the evidence is truly inseparable from the charged crimes and thus is not evidence of "other" bad acts, which is what Rule 404(b) forbids.   Also, the time frame prevents the events from being inextricable intertwined.

In recounting the "circumstances surrounding the offenses for which the defendant[s] were indicted" here, the Government's witnesses did not need to delve into the 404(b) evidence.  Put plainly, the "story of" the charged crimes does not include chapters on Schedule C, tax evasion or puppy fraud.  *See* 1 McCormick On Evid. § 190 (7th ed.) ("Not every story needs lurid embellishment.").  Those stories are certainly salacious and undoubtedly prejudicial to Njei.  The Government thus has no need to tell them in order to "complete the story" of the crimes that it actually charged in this case.  *United States v. D'Alora*, 585 F.2d 16, 20 (1st Cir.1978); *see also United States v. Cureton*, 739 F.3d 1032, 1037 (7th Cir. 2014) ("If evidence is not direct evidence of the crime itself, it is usually propensity evidence simply disguised as inextricable intertwinement evidence.").

### b.      The Government's Evidence was Inadmissible Under Rule 403

Even if evidence passes muster under Rule 404, it is not necessarily admissible.  *See United States v. Sabean*, 885 F.3d 27, 35 (1st Cir. 2018) (holding that admissibility under Rule 404(b) is a "necessary—but not a sufficient—precondition for the admissibility of other-acts evidence").  A court must still evaluate the evidence under Rule 403.  *See* Fed. R. Evid. 404 Advisory Committee Notes (instructing courts evaluating evidence under Rule 404(b) to determine "whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403"); *Old Chief*, 519 U.S. at 182 ("There is . . .  no question that . . . evidence of a prior conviction is

subject to analysis under Rule 403 for relative probative value and for prejudicial risk of misuse as propensity evidence."); *United States v. Sebaggala*, 256 F.3d 59, 67 (1st Cir. 2001) (holding that Rule 404 "incorporates sub silentio the prophylaxis of Federal Rule of Evidence 403").

To the extent that the Government's evidence had any probative value apart from inviting the forbidden propensity inference, that value is far outweighed by the prejudicial effect of this evidence. The Government had no "actual need" for it. *United States v. Cook*, 538 F.2d 1000, 1004 (3d Cir. 1976); Fed. R. 403 Advisory Committee Notes (noting that, when evaluating a 403 challenge, courts must consider "the government's actual need for the evidence"). It would encourage the jury to decide the case on "improper reasoning," *United States v. Looking Cloud*, 419 F.3d 781, 785 (8th Cir. 2005), namely that, because Defendants might have engaged in immoral conduct, they engaged in the charged conduct as well, *see* Fed. R. 403 Advisory Committee Notes (defining unfair prejudice as "an undue tendency to suggest decision on an improper basis"). Moreover, the Government did not need to prove that the Defendant and Minang were associated because this was clear from other evidence and conceded by the Defendant.

The evidence also lead to a trial within a trial, in which the Defendant was be forced to simultaneously defend himself against the actual charges as well as explain Defendant's side of the government's 404(b) side-show stories.[1] *See Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir. 1992) (holding that evidence is inadmissible under Rule 403 when "its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues"). Respectfully, the court's limiting or cautionary instruction constituted mere whistling past the graveyard. *See* Rule 403 Advisory Committee Note (noting that courts must consider "the availability and effectiveness" of a limiting instruction when "reaching a

---

[1] For example the Defendant was forced to take the position that Minang committed the 404(b) puppy fraud in addition to the crimes charged.

decision whether to exclude for unfair prejudice under Rule 403"); *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) (holding that courts must "carefully consider the likely effectiveness of a cautionary instruction that tries to limit the jury's consideration of the evidence to the purpose for which it is admissible").  Hence the Court should have excluded this evidence under Rule 403 as well.

### C. IT WAS LEGALLY IMPOSSIBLE FOR THE DEFENDANT TO VIOLATE THE ANTI-STRUCTURING LAW BECAUSE BANK OF AMERICA WAS LEGALLY REQUIRED TO AGGREGATE SINGLE DAY TRANSACTIONS AT MULTIPLE BRANCHES IN EXCESS OF $10,000 AND FILE A CURRENCY TRANSACTION REPORT WHICH IT DID ACCOMPLISH

A "pure legal impossibility" defense applies "when no statute proscribe[s] the result that the defendant expected, desired, and intended to achieve."  *United States v. Carter,* 15 F.4th 26 (1st Cir. 2022); *United States v. Fernandez*, 722 F.3d 1, 31 (1st Cir. 2013) (citation omitted). "Pure legal impossibility is always a defense" -- including where, as here, the defendants were charged and convicted of the inchoate crime of conspiracy. *Id.*  Legal impossibility is distinct from factual impossibility which "arises when an attempt is frustrated by a physical circumstance of which the actor is unaware."  *United States v. Conigliaro,* 384 F.Supp.3d 145, 153 (D.Mass 2019)(citing *People v. Fiegelman,* 33 Cal. App. 2d 100, 91 P.2d 156 (1939)).  Factual impossibility is not a defense to "... liability ... for inchoate offenses such as conspiracy or attempt."  *Id.;* citing *United States v. Dixon*, 449 F.3d 194, 202 (1st Cir. 2006)).

Here, however, it was legally impossible for the Defendant to violate the anti-structuring laws because the law required BOA to aggregate the Defendant's single day transactions even where they occurred at separate branches.  Specifically, 31 C.M.R. 1010.313 mandates the following:

## Aggregation of Currency Transactions

For the purposes of currency reporting requirements, a bank includes all of its domestic branch offices and, therefore, branch office transactions must be aggregated. Multiple currency transactions resulting in either cash in or cash out totaling more than $10,000 during any one business day must be treated as a single transaction, if the bank has knowledge that they are conducted by or on behalf of any person. Deposits made at night or over a weekend or holiday must be treated as if received on the next business day following the deposit. To comply with regulatory requirements, management must ensure that systems or practices appropriately aggregate currency transactions throughout the bank and report currency transactions subject to the BSA requirement to file CTRs.

Types of currency transactions subject to reporting requirements individually or by aggregation include, but are not limited to: deposits and withdrawals, automated teller machine (ATM) transactions, denomination exchanges, loan payments, currency transactions used to fund individual retirement accounts (IRAs), purchases of certificates of deposit, funds transfers paid for in currency, monetary instrument purchases, certain transactions involving armored car services, and currency to or from prepaid access.

Prior to the CFR modification above, the First Circuit previously held that because aggregation is not explicitly or implicitly required by either the statute or its implementing regulations, imposing criminal liability for such conduct violates the notice provisions of the Fifth Amendment. *United States v. St. Michael's C.U.,* 880 F.2d 579, 595-96 (1st Cir. 1989); *United States v. Anzalone,* 766 F.2d 676, 680–82. In so doing, the Court relied on the venerated tenet that penal statutes must be strictly construed. *See McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987); *Dowling v. United States,* 473 U.S. 207 213–14, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985); *Anzalone,* 766 F.2d at 680–81 (collecting authorities). Accordingly, it was legally impossible for the Defendant to commit the structuring offense as charged.

      D.      **THE SPILLOVER PREJUDICE FROM THE ACQUITTED STRUCTURING CONDUCT MANDATE A NEW TRIAL ON THE REMAINING COUNTS.**

Assuming *arguendo* that this court agrees that the structing count was legally impossible resulting in a judgment of acquittal, it is respectfully submitted that the Defendant is entitled to a

new trial on the remaining counts.  The court also denied a pretrial motion to sever the structuring count that was premised on the Defendant's concerns regarding spillover prejudice and possible differing defenses.  (ECF#63 & #68).

This First Circuit and others have evaluated three factors when weighing a claim that "evidence admitted to prove [a charge of which defendants were] ultimately acquitted by the district court was so extensive, inflammatory, and prejudicial that it necessarily spilled over into the jury's consideration of their guilt on other charges."  *United States v. Mubayyid*, 658 F.3d 35, 72 (1st Cir. 2011); *see also, e.g.*, *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994) (identifying three factors).

*First*, courts assess whether the evidence and jury presentations on the vacated charge "was so inflammatory" that there was a "serious risk" that jury's verdict on the surviving charges was compromised.  *Mubayyid*, 658 F.3d at 73; *see also Rooney*, 37 F.3d at 855 (asking whether evidence "would have tended to incite or arouse the jury into convicting the defendant on the remaining counts"); *United States v. Friedman*, 854 F.2d 535, 581 (2d Cir. 1988) (assessing "inflammatory impact" of evidence on dismissed charges).

*Second*, courts look to the inter-relatedness of the evidence and argument to determine whether the surviving charges are "distinct" from the acquitted charge "to which the challenged evidence had primary relevance."  *Mubayyid*, 658 F.3d at 73.  A claim of spillover prejudice will succeed where "evidence is introduced on the invalidated [charges] that would otherwise be inadmissible on the remaining [charges], and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining [charges]."  *Rooney*, 37 F.3d at 856.

15

*Third*, courts assess whether the surviving charges are "supported by substantial evidence." *Mubayyid*, 658 F.3d at 74; *see also United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995) (making "a general assessment of the strength of the government's case on the remaining counts" (citation omitted)).  Where the evidence is "simply overwhelming," there is no basis for a new trial.  *Mubayyid*, 658 F.3d at 74.  But a new trial can be necessary even where "legally sufficient evidence existed to support the conviction [because] the potential for prejudicial spillover was high." *Rooney*, 37 F.3d at 856.

Here, the record is unequivocal.  Not only does the Defendant's case meet each of these factors, but the same jury that considered the remaining counts had already found him guilty of structuring and was told that the type of conduct he engaged in was evidence of a coverup or attempt to conceal the crime.  Where the structuring was not a criminal offense it is impossible to extricate the structuring from the conspiracy charges.  It was also clear at trial that the evidence was far from overwhelming as best evidenced by a hung jury at the first trial.  As a result, the Court must order a retrial as to the remaining counts.

## III.    CONCLUSION

For the foregoing reasons, the Court is respectfully urged to enter a judgment of acquittal in the Defendant's favor and/or to order a new trial.

Respectfully submitted,

Peter Charles Horstmann, Esq.
BBO #556377
450 Lexington Street, Suite 450
Newton, Massachusetts 02466
(617) 519-9011
*pete@horstmannlaw.com*

## <u>CERTIFICATE OF SERVICE</u>

      I, Peter Charles Horstmann, hereby certify that on this 23nd day of December, 2022, a copy of the the instant Motion was electronically served  upon William Brady, Assistant United States Attorney, United States Attorneys Office, One Courthouse Way, Boston, MA 02210 and all counsel of record.

Peter Charles Horstmann, Esquire