UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:21-10196-FDS |
| ) | |
| GUSTAF NJEI, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States Attorney, by and through the undersigned Assistant United States Attorneys, hereby respectfully submits this memorandum in connection with the sentencing of the defendant in this case, Gustaf Njei ("Njei" or "Defendant").

The victims in this case were tricked into wiring hundreds of thousands of dollars to an account controlled by the Defendant. The Defendant set up that bank account in the name of a fake business, "Njei Trading" – a name that sounded just legitimate enough that victims might think that it was part of a legitimate business transaction, such as a real estate closing. That is how this business email compromise ("BEC") scheme worked: it preyed on the trust of victims who were simply going about their daily business; victims who trusted that the person on the other end of an email was who he said he was. When the victims realized that they had been duped, they were devastated, and it was not just about the money. As a representative of Victim B described in a victim impact statement, when he realized that he had been tricked into wiring $375,000 of his client's money to the Defendant's fraudulent account:

> *I died inside. Where did these funds go? Those were the Buyer's funds and I knew my company would be responsible for them. ... I lost sleep for 4-5 months, in fear that the $375,000 would never be credited back to my account. I even wondered if we'd have to shut down our company that had been in business for nearly 25 years because of this situation.*

*See* Ex. A.

The Defendant knew it was a fraud; as his coconspirator testified at trial, it was obviously a fraud. The Defendant saw easy money, and lots of it; that is all that mattered to him. At the time, the Defendant was a grown man, smart and well educated. Nobody forced him to participate in the scheme. As soon as the victims' money came into his bank account, the Defendant withdrew some, sent some to a coconspirator overseas, and then spent some on a personal shopping spree at the mall. The Defendant only stopped when the money was gone, after Victim B reported the fraud to the bank and the funds remaining in the account were frozen.

It is a story that is all too common. FBI statistics show that since June 2016, victims have lost over $43 billion to BEC fraud schemes like the one carried out by the Defendant here. These crimes are committed on a massive scale, by individuals who, like the Defendant, see easy money and are willing to take the risk. These individuals believe, like the Defendant once did, that they will not get caught—that they will not face any consequence for their role in such schemes. The sentence imposed here should deter others who might consider taking the same risk and send a clear message that if they commit these serious crimes and get caught, they will face serious consequences.

For these reasons, as further set forth below, the government recommends a sentence of 41 months, 36 months supervised release, restitution in the amount of $94,630.91, and a forfeiture money judgment in the same amount ($94,630.91).

I.      **FACTUAL BACKGROUND**

On December 9, 2022, a federal jury found the Defendant guilty of all counts charged in the Indictment in this case: two counts of wire fraud (Counts 1 and 2); one count of structuring to

avoid reporting requirements (Count 3); one count of unlawful monetary transactions (Count 4); and one count of money laundering conspiracy (Count 5). PSR ¶ 2.

As set forth in the Pre-sentence Investigation Report ("PSR"), the Defendant participated in a BEC scheme that stole more than $400,000 from two separate victims. *Id.* ¶¶ 8, 13, 18. The Defendant's role was to open bank accounts in the name of a fake company ("Njei Trading") and then receive and launder the fraud proceeds through the accounts. *Id.* ¶¶ 9. The Defendant was the only signatory on the fraudulent Njei Trading bank accounts.

The first victim, identified as Victim A in the Indictment, had a brokerage account with Merrill Lynch. *Id.* ¶ 13. Using a spoofed email account, an unknown coconspirator tricked Merrill Lynch into wiring $85,430.91 from Victim A's account to the Defendant's Njei Trading bank account. Immediately after that transfer, the Defendant withdrew $28,500 from four different bank locations in approximately two hours – with each withdrawal just under the $10,000 threshold for the bank's reporting requirements. *Id.* ¶ 15. The Defendant and a coconspirator also went to the mall and made over $4,400 in purchases at various stores using the debit card linked to the Njei Trading account. *Id.* ¶ 16. The Defendant also wired $34,000 of the fraud proceeds to a bank account controlled by a coconspirator in South Africa. *Id.* ¶ 17.

The second victim, identified as Victim B in the Indictment, was a Florida-based real estate brokerage firm. *Id.* ¶ 18. Victim B's representative received an email from a real estate agent with whom Victim B was conducting a real estate closing. Unbeknownst to Victim B, that agent's email account had been hacked and taken over by one of the Defendant's coconspirators. *Id.* Victim B was tricked into wiring $375,000 to the Defendant's Njei Trading bank account. *Id.* As before, the Defendant went to the bank and immediately withdrew part of the fraud proceeds. This time, however, the Defendant was only able to withdraw $9,200 before Victim B

alerted the bank and the Njei Trading account was frozen. The remainder of the money wired by Victim B ($365,800) was eventually returned to Victim B. *Id.*

## II.  DISCUSSION

In determining a defendant's sentence, the Court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the Court must consider the various factors set forth in 18 U.S.C. § 3553(a). In doing so, the Court should impose a sentence "sufficient, but no greater than necessary" to achieve the legitimate goals of sentencing. *United States v. Vargas-Garcia*, 794 F.3d 162, 168 (1st Cir. 2015).

### A.  Sentencing Guideline Calculations

In the PSR, the Probation Office calculates the Defendant's offense level as 22, which combined with the Defendant's criminal history category of I results in a guideline sentencing range ("GSR") of 41-51 months.

#### 1.  Government Objection to PSR

The government has objected to Probation's calculation of the Defendant's offense level because it should be 23, one level higher. The issue is that in calculating the offense level for the money laundering conspiracy count (Count 5), the PSR starts with a base offense level of 6, when the correct base offense level is 7, the base offense level for the wire fraud counts (Counts 1 and 2). *See* PSR ¶ 26.

The PSR bases its calculation on its application of the money laundering guideline, USSG § 2S1.1. But in adopting § 2S1.1, the Commission made clear that its express purpose was to ensure that "*all direct money launderers will receive an offense level that is one to four*

4

*levels greater than the Chapter Two offense for the underlying offense.*"[1] *See* Guidelines Supp. to Appx. C ("Commission Policy"), amend. 634, at 230 (Nov. 1, 2001), *available at* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/APPCSUPP.pdf ("[T]his amendment provides for three alternative enhancements . . . [that] are designed to (1) ensure that all direct money launderers receive additional punishment for committing both the money laundering offense and the underlying offense...").

To accomplish this mandate, the Commission directs courts to calculate the underlying offense for direct money launderers as follows:

> For direct money launderers . . . subsection (a)(1) sets the base offense level at the offense level in Chapter Two (Offense Conduct) *for the underlying offense* (*i.e.*, the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense).

Commission Policy at 229 (emphasis added); *see also* U.S.S.G. § 1B1.5(b)(1) ("An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline.").

In other words, § 2S1.1(a)(1) requires an independent calculation using the complete substantive guideline for the underlying offense – including any instructions or references contained therein – before turning to the money laundering guideline. *See United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006) (holding that § 2S1.1(a) requires that "before considering what money-laundering adjustments to apply to [defendant]'s sentence, the court first had to calculate the sentence as it would have applied to the [underlying] extortion counts *standing alone*, making reference to [the underlying extortion guideline]" before returning to

---

[1] In adopting Section 2S1.1, the Commission defined direct money launders to be offenders, like the Defendant, "who commit or would be accountable . . . for the underlying offense which generated the criminal proceeds." Commission Policy at 229.

§ 2S1.1) (emphasis added); *see also United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) ("The total Guidelines offense level for such 'underlying offense,' *after being independently calculated* by applying all appropriate adjustments, and considering any relevant conduct under U.S.S.G. § 1B1.3 . . . is then used as the base offense level for money laundering . . . .") (emphasis added and citation omitted). As the Seventh Circuit aptly stated: "[a]dding levels for 'all' direct launderers is possible only if . . . § 2S1.1(a)(1) plugs the full offense level for the substantive guideline into the 'base' level for money laundering." *United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009).

Courts in this District have split on whether to adopt Probation's application of this guideline. In *United States v. Minang*, 19-cr-10264-PBS ("*Minang II*"), Judge Saris overruled the same government objection and adopted a base offense level of 6 in connection with a similar BEC scheme. However, in *United States v. Toure*, 19-cr-10369-MLW, Judge Wolf rejected Probation's calculation and adopted a base offense level of 7, citing the First Circuit's reasoning in *Cruzado-Laureano*, 440 F.3d at 48, and decisions from the Ninth and Sixth Circuits, *see United States v. Salado*, 590 Fed. Appx. 692, 693 (9th Cir. 2015) (base offense level 7 where defendant convicted of money laundering offense and an offense reference to § 2B1.1), and *United States v. Nikolovski*, 565 Fed. Appx. 397, 401-02, n.4 (6th Cir. 2014 (same)).

With the base offense level of 7 for the money laundering conspiracy count, the total offense level is 23. This results in a GSR of 46-57.

2. <u>Defense Objections to PSR</u>

The Defendant has objected to Probation's calculation of the guidelines in three places. None of these objections is valid.

6

*First*, the Defendant takes issue with the 12-level increase because the intended loss of $460,430.91 was more than $250,000, but not more than $550,000.  PSR ¶ 27, citing USSG § 2B1.1(b)(1)(G).  The Defendant argues that it is unfair to apply more than a 6-level increase because most of the money wired by Victim B was refunded and there was "no evidence at trial that the Defendant knew at any time for either transaction how much money was coming in prior to the time that it hit the account."  The Defendant is incorrect.  The PSR correctly applies § 2B1.1(b)(1) in using the *intended* loss, which was $460,430.91, the full amount wired and received into the Defendant's bank account as part of the scheme.[2]  As Application Note 3(A) to § 2B1.1 makes clear, "loss is the greater of actual or intended loss," and here that is the intended loss.  Nor does the Defendant get any credit for the portion of the $375,000 wire that was frozen and later returned to Victim B: under Application Note 3(E), loss is reduced for money returned *before* the offense was detected.  The evidence here established that the Defendant sought to take out his cut of the $375,000 wire, just as with the first $85,000 wire.  The only difference is that Victim B detected the fraud in time to stop the Defendant from taking out more of the stolen funds.

*Second*, the Defendant objects to the 2-level increase under § 2B1.1(b)(10) because the offense involved sophisticated means.  As the PSR correctly notes, the Defendant opened sham bank accounts in the name of a fake business solely for the purpose of carrying out the scheme.  The Defendant then made structured withdrawals from those accounts in an attempt to conceal the fraud, as well as a wire transfer to a bank account in South Africa.  PSR ¶ 28.  The use of

---

[2] In fact, that amount was the actual loss as well, notwithstanding the later return of a significant portion of the funds.  For calculating loss under the guidelines, the Defendant is not entitled to credit for funds that were returned only after the scheme was detected by one of his victims.

7

"fictitious entities," such as Njei Trading, is one of the hallmarks of sophisticated means. *See* Application Note 9(B); *see also United States v. Fish*, 731 F.3d 277, 28 (3d Cir. 2013) (factors for sophisticated laundering listed in Application Note are "illustrative but not required; they are typical but non-exhaustive").

In *United States v. Minang*, 17-cr-10376-FDS (*Minang*), this Court applied a similar enhancement to similar conduct. (In *Minang*, the 2-level enhancement was under USSG § 2S1.1(b)(3), for sophisticated laundering. While the PSR instead applies the 2-level enhancement under § 2B1.1(b)(10), the analysis is similar given the overlapping factors considered for both enhancements.) In that case, the defendant argued that the accounts were "opened in his own name" and "linked with his true and actual residence." But as the Court noted, the application note says sophisticated laundering typically involves the use of fictitious entities, shell corporations, two or more levels, i.e., or transmissions or offshore financial accounts, and all of those factors were present. Here as well, the Defendant used fictitious entities ("Njei Trading") and wired funds to an offshore account in South Africa. This is sufficient for the 2-level enhancement to apply. *See United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) (when one of the factors are met "the commentary clearly subjects an individual to the sophisticated laundering enhancement").

*Third*, the Defendant objects to the PSR's lack of a 4-level reduction for his role as a "minimal participant" in the offense. The Defendant claims that his role in the offense was "dictated entirely by his youthfulness, neglect as a child and relationship with [CW-1]." That is not the record here, and it does not come close to meeting the standard for a "minimal participant" reduction. The First Circuit has held that "to qualify as a minimal participant, a defendant must prove that he is among the least culpable of those involved in the criminal

activity." *United States v. Santos*, 357 F.3d 136, 142 (1st Cir. 2004). This "entails proof that he is substantially less culpable than his cohorts in the actual offense *and* that he is substantially less culpable than *the vast majority of those taking part in similar crimes*." *Id.* (emphasis added); *see also United States v. Kerr*, 13 F.3d 203, 206 (7th Cir. 1993) (refusing reduction for minimal participation where defendant did not prove that she was substantially less culpable than the average participant in similar crimes). As the First Circuit has made clear, "This standard is hard to meet and, accordingly, it will be the rare case in which a defendant will warrant designation as a minimal participant." *Id.*

This is not one of those rare cases. The Defendant was a grown-up when he participated in these crimes and was only two years younger than CW-1, who recruited him to take part in the fraud. The Defendant again argues that he was "groomed" and misled by CW-1, but the jury heard and rejected that very argument when it found the Defendant guilty of knowingly and willfully participating in this wire fraud and money laundering scheme. The Defendant was the sole owner and signatory on the fraudulent Njei Trading account, an account in the name of a business that the Defendant knew was fake. None of the transactions could happen without the Defendant, which is why he received a 20% cut of the fraud proceeds – the same cut that CW-1 received. The Defendant shared in the profits of the scheme, which he knew and understood to be fraudulent. He raced from bank to bank to take out the proceeds of the fraud, and then spent even more money at the mall – money that he knew had been stolen from the victims of fraud. The Defendant could see that the wire into the account was from a Merrill Lynch account in the name of people he did not know. He could have stopped after that first wire, from Victim A, but he kept going; the more money he laundered through his account, the more money he pocketed.

He used his account to defraud a second victim, Victim B, and again immediately withdrew the fraud money. He only stopped because the bank caught on and froze the accounts.

The law is clear: "a defendant need not be the key figure in a conspiracy in order to be denied a mitigating role-in-the-offense adjustment." *United States v. Melendez-Rivera*, 782 F.3d 26, 29 (1st Cir. 2015) (citing cases). Drug couriers, for example, cannot lay claim as of right to minor participant status – and indeed, the First Circuit has upheld the denial of a 2-level "minor participant" reduction to drug couriers. *See Santos*, 357 F.3d at 143. As the jury found, the Defendant was deeply involved in the execution of this scheme; there is no good reason to believe that he was less culpable than the "mine-run of those who have committed similar crimes." *See Melendez-Rivera*, 782 F.3d at 29. The PSR correctly omits any adjustment for the Defendant's role in the offenses.

3. **3553(a) FACTORS**

Here, the government's recommendation is <u>41 months</u> incarceration, which is the low end of the GSR as calculated by Probation. There is no reason to depart from the guidelines range in this case. In arriving at this recommendation, the government has taken all relevant factors into account, including but not limited to the nature of the offense, the Defendant's history and characteristics, and the need to afford adequate deterrence. These factors are considered below.

*First*, the government's recommendation appropriately reflects the nature and seriousness of the offense and would provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The Defendant knowingly and willfully took part in a scheme to steal money from innocent victims: a family that had saved up and set aside money in a retirement account, and a family business dealing in real estate. These victims thought they were responding to legitimate emails, and wiring money to accounts based on what they assumed were legitimate wire instructions. But it

was all a sham. In total, victims wired over $460,000 to the fraudulent Njei Trading bank account. That was the Defendant's role: providing the fraudulent bank accounts so that the fraud proceeds could be received, laundered, and sent on to coconspirators overseas (after the Defendant took his cut).

The proposed sentence is in line with the sentence this Court imposed in *Minang*, which is a close comparable to this case. In that case, Minang did the same thing that the Defendant is convicted of doing here: opening sham bank accounts in the name of fake businesses, for the sole purpose of laundering the proceeds of a BEC fraud. Like the Defendant, Minang wired a portion of the fraud proceeds outside the United States to Old Soldier. And like the Defendant, Minang took a share of the fraud proceeds as his cut. With a 2-level reduction for acceptance of responsibility, Minang's total offense level was 22, and his GSR was 41 to 51 months—the same GSR as calculated by Probation here. The Court sentenced Minang to 46 months. The government is proposing 41 months for the Defendant here: it is essentially the same conduct, and the Defendant has not accepted any responsibility for his role. While the same sentence would be appropriate, the government recognizes that the Defendant was recruited by CW-1, who provided direction to the Defendant as they carried out these crimes together. The government's recommendation thus takes into account the Defendant's role relative to others involved in the scheme.

*Second*, the Defendant's history and characteristics, as set forth in the PSR, support the government's recommendation. *See* 18 U.S.C. § 3553(a)(1). The PSR describes certain hardships the Defendant experienced growing up in Cameroon, but also notes that the Defendant grew up in a loving and peaceful environment. PSR ¶ 49. While the hardships described by the Defendant were significant, they in no way excuse – or even explain – his decision to commit

these serious financial crimes. These were not crimes of desperation; they were crimes of greed. The Defendant saw others in his circle committing similar crimes, making what seemed like easy money and – at least for a time – getting away with it. He wanted that easy money too – easy money he spent at the mall on video games, sneakers, and jewelry. In fact, the Defendant had advantages that many defendants who come before this Court lack: he was smart, an engineering student (who would go on to earn a degree from Northeastern University), with a supportive family and the opportunity to live and work in the United States. The Defendant focuses on his youth, but he was 22 when he committed these crimes. He was, simply put, old enough to know better.

To the extent that Defendant argues that this fraud scheme was "aberrant" behavior – an isolated incident, a youthful mistake that resulted from a "destructive friendship" with CW-1 – that is not supported by the record here. As the evidence at trial showed, the Defendant participated in another fraud scheme with CW-1 *after* CW-1 was arrested and charged with federal crimes—that was the "puppy scam" that the Defendant carried out in 2018, where he used a fake ID to launder the proceeds of *that* fraud as well. *See* PSR ¶ 9. The Defendant callously ripped off an innocent victim who was lured in by the Defendant and his coconspirators with pictures and videos of an adorable puppy. Even then, the Defendant was not done: in May 2021, the Defendant applied for and obtained a fraudulent Paycheck Protection Program ("PPP") loan in the name of *another* fake business. *Id.* ¶ 39. The Defendant falsely claimed that the fake business had $245,000 in gross income for tax year 2020 – a year when, according to the PSR, the Defendant was earning $20-23 per hour as an "intern design engineer" from January to June 2020 and was then unemployed and "financially supported by his mother and sister" from June 2020 onward. *Id.* ¶¶ 71-72. To be clear, the government does not cite this as conduct relevant to

the offenses of conviction, nor does the government base its recommended sentence on this conduct. Rather, the government notes the Defendant's involvement in other fraudulent schemes as information relevant to the Defendant's characteristics, and information that is relevant and fair to consider should the Defendant argue that the offense conduct here was "aberrant."

*Third*, the government's recommended sentence of 41 months incarceration will "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(2)(B) and (C). Such a sentence would send a message to the Defendant that his participation in online fraud schemes must end here. It would protect victims from further attempts by the Defendant to take money that does not belong to him. Such a sentence, combined with the Defendant's potential removal from the United States following its conclusion, would provide adequate protection against further crimes of the Defendant.

Perhaps more importantly, the recommended sentence would send a strong message to others who might be tempted by the seemingly "easy money" available to those who, like the Defendant, decide to participate in BEC schemes. Those individuals are out there, in staggering numbers, preying on individuals and businesses every day. BEC schemes are typically a volume business: they cost next to nothing, the risk of getting caught is relatively low, and all it takes is one victim – one or two people like the victims in this case – to make a lot of money very fast. The Court will recall what CW-1 told the Defendant when he recruited him to participate in this scheme: "Don't worry, it's safe" – meaning, "We won't get caught." And despite the efforts of law enforcement to tackle this growing menace, CW-1's assumption was a fair one, given that only some of the individuals who participate in these schemes end up getting caught and paying a price.

Statistics tracked by the FBI illustrate the scope of this problem. In May 2022, the FBI's Internet Crime Complaint Center ("IC3") reported that between June 2016 and December 2021 there were over 241,000 reported domestic and international BEC schemes with over ***$43 billion*** in losses.[3] As the FBI has stated, BEC scams continue to grow and evolve, "targeting small local businesses to larger corporations, and personal transactions."[4] Between July 2019 and December 2021, there was a 65% ***increase*** in identified global exposed losses, meaning the dollar loss that includes both actual and attempted loss in U.S. dollars.[5] What all of these BEC schemes have in common is that the criminals must find a way to move and hide their illicit funds.[6] They need someone like the Defendant – and there is, apparently, no shortage of people who are willing to take that risk.

Given the nature of these crimes, the need for general deterrence is critical. Individuals who are tempted by such "easy money" need to know that when they get caught, they will face serious consequences, including a significant prison term. They need to factor that into their risk calculus—and hopefully that will dissuade some from participating in the future. These BEC schemes are pernicious, and as more and more of our lives are lived online, interacting with people and businesses we never meet face-to-face, the opportunities for fraudsters will only increase. The consequences for the victims of these schemes are often devastating: family savings lost, businesses and reputations ruined. The consequences for those who are caught,

---

[3] *See* FBI 2022 Congressional Report on BEC and Real Estate Wire Fraud, available at: https://www.fbi.gov/file-repository/fy-2022-fbi-congressional-report-business-email-compromise-and-real-estate-wire-fraud-111422.pdf/view.
[4] *Id.* at 12.
[5] *Id.*
[6] *Id.* at 5.

tried, and convicted for their part in such schemes should track accordingly. A strong message should be sent here, and the recommended sentence would do just that.

## CONCLUSION

For these reasons, the government recommends that the Court sentence the Defendant to a term of imprisonment of 41 months, 36 months of supervised release, restitution, and forfeiture in the amounts set forth above.

                    Respectfully submitted,

                    RACHAEL S. ROLLINS,
                    United States Attorney

By:   */s/ William B. Brady*
       William B. Brady
       Benjamin A. Saltzman
       Assistant U.S. Attorneys

Dated: March 2, 2023

## CERTIFICATE OF SERVICE

I hereby certify that, on the below date, this document was filed through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing.

                    */s/ William B. Brady*
                    William B. Brady
                    Assistant U.S. Attorney

Dated: March 2, 2023